AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. **1:22-MJ-00039** |
| ELECTRONIC DEVICES MORE FULLY DESCRIBED IN ATTACHMENT A | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1958 | Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire |
| 18 U.S.C. § 922(g)(3) | Possession of a Firearm by a Prohibited Person |

The application is based on these facts:

See attached affidavit.

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Joseph M. Ruchti, ATF Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____FaceTime_____ *(specify reliable electronic means)*.

Date: 1/14/22
_____

_____
*Judge's signature*

City and state: Cincinnati, Ohio

Hon. Stephanie K. Bowman, U.S. Magistrate Judge
*Printed name and title*

## ATTACHMENT A

*Property to be Searched*

1.      The property to be searched is currently located in ATF Property under case

number 773010-21-0113 at ATF Cincinnati Field Office, 550 Main Street, Room 8-491,

Cincinnati, Ohio 45202 and listed as the following ATF Property Numbers:

a. Item 031 – Apple iPad Mini tablet, model A1490, in black case, no serial number visible

b. Item 032 – Vicfun brand thumb drive (usb), no serial number visible

c. Item 033 – Apple MacBook laptop computer, model A1466, no serial number visible

d. Item 034 – Alcatel cellular telephone, flip style, black, no serial number visible

e. Item 035 – T-Mobile cellular telephone, IMEI 015727002609221, with cracked screen

f. Item 036 – Samsung Galaxy S7 Edge cellular telephone, black case, no serial number visible

g. Item 037 – Alcatel cellular telephone, flip style, black, no serial number visible

h. Item 038 – Samsung cellular telephone, IMEI 354084111149635, cracked screen and rear cover

i. Item 039 – LG cellular telephone, cracked screen, black

j. Item 040 – Apple iPhone cellular telephone, white, no serial number visible

k. Item 041 – Samsung SM-N975U1 cellular telephone, IMEI 35901100438075, blue

l. Item 042 – Apple iPhone A1549 cellular telephone, IMEI 354450066736033, silver

m. Item 043 – Huawei cellular telephone, black, no serial number visible

n. Item 044 – Apple iPhone cellular telephone, black, no serial number visible

o. Item 047 – Apple iPhone cellular telephone, model 13, serial number P4T64DQGH4

p. Item 048 – Apple iPhone cellular telephone, model SE, serial number DX4G2JAFPLJM

This warrant authorizes the forensic examination of the Devices for the purpose of identifying

the electronically stored information described in Attachment B.

## ATTACHMENT B

*Property to be Seized*

1. All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. § 1958 (Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire) and 18 U.S.C. § 922(g)(3) (Possession of a Firearm by a Prohibited Person) and involve Jamal BINFORD, Antwan COACH, and Markel HARDY.

    a. Records and information relating to a conspiracy to commit of Murder-For-Hire;

    b. Records and information relating to the commission of Murder-For-Hire;

    c. Records and information relating to the possession, purchase, sale, or trafficking of firearms;

    d. Records and information relating to the identities and whereabouts of co-conspirators to the scheme;

    e. Records and information relating to the proceeds of the Murder-For-Hire;

    f. Records and information relating to phone numbers, email addresses, social media accounts, and other accounts used by coconspirators to the scheme;

    g. Records and information relating to the use and purchase of marijuana

2. Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO

IN THE MATTER OF THE SEARCH OF
ELECTRONIC DEVICES CURRENTLY IN
ATF PROPERTY AT 550 MAIN STREET,
ROOM8-491, CINCINNATI, OH 45202

Case No. __1:22-MJ-00039__

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Joseph M. Ruchti, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant authorizing the examination of property – **Devices**, further described in Attachment A – that is currently in law enforcement possession, and the extraction from that property of electronically stored information further described in Attachment B.

2.      I am a Task Force Officer with the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF), and have been so assigned since May of 2010. I am an officer with the Cincinnati Police Department and have been so employed since August of 2001 and have been assigned as a detective since 2007. As a part of my training with the CPD, I graduated from the Ohio Peace Officer Basic Academy (Cincinnati) in June of 2002. Prior to my employment with CPD, I was Military Police Officer, United States Army, from 1995 to 2000 where I was assigned to Garrison Law Enforcement Operations and undercover Drug Suppression Team duties with the U.S. Army Criminal Investigation Command. I attended Ohio University where I was enrolled in the Independent Studies Program with a concentration in Sociology.

3.     I have received training in advanced electronic surveillance techniques, analysis of digital evidence, and have over 300 hours of training in advanced investigative techniques. I have experience in the investigation, apprehension, and prosecution of individuals suspected of being involved in federal firearms and drug offenses, and offenses of violence. I have specific experience in investigating the use of cell phones by criminal suspects who are involved in the commission of those offenses. I also have knowledge of the technology used by law enforcement authorities to identify cell phone users and geographic locations.  I have successfully used these records in the prosecution of offenders in state and federal courts.  I have also reviewed forensic extractions of cellular telephones, computers, and other electronic storage media, and have examined content and communications contained within these devices obtained by forensic extraction.  This content includes records of communication through call logs, text message content, images and videos, and communication made through various social media applications.

4.     I know from training and experience that individuals typically keep cell phones on their persons or within their immediate control, such as in the cupholder of a car they are driving or in pockets of their clothing, because cell phones are regularly used and possessed as an item of personal property.  I also know from my training and experience that in today's age it is typical for individuals engaged in criminal activity to possess multiple active cellular phones at one time. At times secondary phones used for criminal activity may be secreted in residences or other locations to prevent discovery by law enforcement.  For example, many criminals have one phone that they use for personal communications (e.g., with family members) and another phone that they use to communicate with criminal associates.  Similarly, I know that those engaged in violent crime and conspire to commit violent crime routinely transfer their cellular service to new devices, obtain new cellular service on old devices, or obtain new cellular service on a new

device, in an effort to obstruct investigations by law enforcement. For example, if one phone is wiretapped, law enforcement may not be able to identify all participants of the violent crime and / or conspiracy to commit violent crime due to the complexity of the cellular usage by the participants of the conspiracy. I also know from experience that it is common for individuals to keep and store their old cell phones, because they may not want to lose information and photos saved to that device; such "old" phones may also contain information relevant information to ongoing criminal investigations.

5.      Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1958 and 18 U.S.C. § 922(g)(3) have been committed by known and unknown suspects, including but not limited to JAMAL BINFORD. There is also probable cause to search the electronic devices described in Attachment A for evidence of these crimes, further described in Attachment B.

6.      The facts in this affidavit come from my personal observations; my training and experience; information obtained from other agents, law enforcement officers and personnel; and information provided by witnesses. This affidavit is intended to show only that there is sufficient probable cause to support the issuance of the requested warrant and does not set forth all of my knowledge about this matter.

## **RELEVANT STATUTES**

7.      An  individual violates 18 U.S.C. § 1958 (Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire) if he or she: travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as

consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so.

8. An individual violates 18 U.S.C. § 922(g)(3) (Possession of a Firearm by a Prohibited Person) if they possess a firearm while being an unlawful user of or addicted to any controlled substance (as defined in section 102 of the Controlled Substances Act, 21 U.S.C. § 802).

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

9. The property to be searched is described as follows (collectively, the "Devices"):

   a. ATF Item 031 – Apple iPad Mini tablet, model A1490, in black case, no serial number visible
   b. ATF Item 032 – Vicfun brand thumb drive (usb), no serial number visible
   c. ATF Item 033 – Apple MacBook laptop computer, model A1466, no serial number visible
   d. ATF Item 034 – Alcatel cellular telephone, flip style, black, no serial number visible
   e. ATF Item 035 – T-Mobile cellular telephone, IMEI 015727002609221, with cracked screen
   f. ATF Item 036 – Samsung Galaxy S7 Edge cellular telephone, black case, no serial number visible
   g. ATF Item 037 – Alcatel cellular telephone, flip style, black, no serial number visible
   h. ATF Item 038 – Samsung cellular telephone, IMEI 354084111149635, cracked screen and rear cover
   i. ATF Item 039 – LG cellular telephone, cracked screen, black
   j. ATF Item 040 – Apple iPhone cellular telephone, white, no serial number visible
   k. ATF Item 041 – Samsung SM-N975U1 cellular telephone, IMEI 35901100438075, blue
   l. ATF Item 042 – Apple iPhone A1549 cellular telephone, IMEI 354450066736033, silver
   m. ATF Item 043 – Huawei cellular telephone, black, no serial number visible
   n. ATF Item 044 – Apple iPhone cellular telephone, black, no serial number visible
   o. ATF Item 047 – Apple iPhone cellular telephone, model 13, serial number P4T64DQGH4

    p.   Item -48 – Apple iPhone cellular telephone, model SE, serial number DX4G2JAFPLJM

The Devices are currently located at ATF Property at 550 Main Street, Room8-491, Cincinnati, Ohio 45202.

    10.    The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data further described in Attachment B.

## PROBABLE CAUSE

**A.    Investigators determined that a firearm possessed by Antwan COACH was used in three shootings in July and August 2021.[1]**

    11.    On July 5, 2021, at approximately 3:02 p.m., the Cincinnati Police Department (CPD) and the North College Hill Police Department (NCHPD) received a report of a person shot at 1566 Galbraith Road, Cincinnati, Ohio 45231. Responding officers located Kamar Williams at that address suffering from gunshot wounds. Kamar Williams was transported to the University of Cincinnati Hospital where he was pronounced dead. Witnesses said that a black male, in his teens, wearing white t-shirt, fled the scene in a tan or gold Buick SUV with a partial license plate of "HB." Responding officers initiated a K-9 "track" in an attempt to locate any suspects that fled on foot. Officers were unable to locate any further persons or evidence. Law enforcement recovered discarded shell casings from the crime scene.

    12.    On July 21, 2021, at approximately 1:24 a.m., the Cincinnati Police Department received a "ShotSpotter Alert" at 2720 Price Ave, Cincinnati, Ohio 45204. ShotSpotter is a real-time gunshot detection system consisting of numerous acoustic sensors strategically deployed throughout a monitored geographical area that activates and records suspected gunshots. Those

---

[1] Information about local law enforcement investigations in this affidavit was generally provided by personnel, reports, and material provided by those local law enforcement departments or offices, except as otherwise indicated.

activations are sent to a monitoring center where trained technicians determine if the activation was triggered by gunfire or by other sounds similar to gunfire. Upon determining that gunfire triggered the ShotSpotter activation, the affected law enforcement agency is notified of the location of the gunfire and provided with an immediate audio recording of the gunfire. The ShotSpotter location notification is typically accurate within a radius of 3 to 5 meters.

13. Responding officers met with witnesses at 2720 Price Avenue and located approximately 18 bullet holes in the structure. Discharged shell casings were found inside and outside the building during the investigation. Witnesses described seeing in the area a silver or grey Honda Accord, partial plate starting with "GVD," that was occupied with a black male with dreadlocks and a white male passenger. The white male held a firearm out of the passenger window and fired at the building numerous times. Initial examination of the unique firearm class characteristic markings of the crime scene casings indicated three separate 9mm firearms were discharged during the offense.

14. The National Integrated Ballistics Network (NIBIN) is a nationwide data network administered by the Bureau of Alcohol Tobacco and Firearms (ATF). NIBIN has a database containing 3-dimensional microscopic images of shell casings collected from crime scenes and test fire cartridges generated from recovered crime guns by law enforcement agencies across the country. These crime scene and test fire cartridges are collected, imaged, and submitted by the respective agencies for comparison to existing submissions contained within NIBIN. NIBIN correlates these submissions into likely matches that are subsequently verified by a NIBIN examiner, and subsequently subjected to a peer-review process, that determines multiple shell casings were generated by the same firearm which resulted in unique tooling marks and characteristics being transferred from the firearm to each shell casing. This information results

in the publishment of an investigative lead showing commonalities between each crime event. On July 23, 2021, I was assigned as the ATF investigator to the investigation of NIBIN Lead 210757. On July 22, 2021, NIBIN Lead 210757 was published indicating that the same 9mm caliber firearm that shot into the habitation at 2720 Price Avenue was used to murder Kamar Williams on July 5, 2021 at 1566 Galbraith Road, North College Hill, 45231.

15.     On August 2, 2021, I obtained a search warrant in the Hamilton County, Ohio Court of Common Pleas requesting business records from T-Mobile detailing phone activity of phone number 513-602-6763. Examination of data obtained from the forensic download of Kamar Williams' cell phone, which was located during the processing of the murder crime scene, showed this phone number was the last to contact Williams through calls, text messages, and Facebook Messenger, and arranged a narcotics transaction minutes before he was murdered. The search warrant was authorized and signed by the Honorable Alan Triggs, Criminal Judge, Hamilton County Court of Common Pleas. This phone number contacted Kamar Williams' phone on July 5, 2021, just minutes prior to Williams's murder. Messages contained in Williams' cell phone shows the user of this number, believed to be Antwan COACH Jr., contacted Williams and arranged to meet him at the location where Williams' body was found after being shot.

16.     On August 3, 2021, I received business records from T-Mobile related to phone number 513-602-6763. The records showed that the 513-602-6763 phone number was subscribed to Antwan COACH, 6927 Pinoak Drive, Cincinnati, Ohio 45239, effective May 5, 2021. Further, T-Mobile records showed COACH's cellular device interacted with "cell sites" that service the geographical area—specifically the sector of service—where Williams was murdered during a span of time that was within minutes of Williams being murdered. Therefore,

7

I determined, based on my training and experience, that COACH's cellular device was in the vicinity of cellular service where Williams was murdered during the window of time that included the murder.

17.     A review of Ohio BMV Records revealed COACH obtained an Ohio Identification card, ID Number TU161070, on July 26, 2021 and listed 6927 Pinoak Drive, Cincinnati, Ohio 45239, as his residence.

18.     On August 4, 2021, I, along with ATF agents and officers with the Cincinnati Police Department, established surveillance at 6927 Pinoak Drive, Cincinnati, Ohio 45239. Surveillance participants witnessed a 2013 Gold Buick SUV, with Ohio license plate ERB2587, leave the residence. This SUV matched description given by witnesses on July 5, 2021, during the North College Hill Police Department homicide investigation into the Williams murder. During surveillance, agents and officers saw COACH driving the vehicle and followed it to an apartment building, identified as the Sycamore Place Lofts, 716 Sycamore Street, Cincinnati, Ohio 45202. As COACH exited the vehicle, he placed an unknown object under the driver's seat and looked around the immediate area before entering the apartment building. COACH returned to his vehicle approximately five minutes later and prepared to pull from the curb.

20.     Uniformed Cincinnati Police Officers approached COACH as he entered the driver's seat of the vehicle. Officers knew COACH had no valid driver's license after querying him in law enforcement databases. As the uniformed officers approached the vehicle, the surveillance units saw COACH engage in furtive movements, appearing to hide and conceal items in the vehicle within his wingspan. Officers searched COACH and his immediate

wingspan of the vehicle for weapons based on information learned during this investigation and his observed behavior, and located approximately twenty grams of suspected heroin under the driver's seat. COACH was also found in possession of two cellular devices, further described as a red iPhone (Phone #1) housed in a clear protective case and a blue iPhone (Phone #2) housed in a black protective case.

22. On August 4, 2021, I drafted and obtained a search warrant authorizing the search of 6927 Pinoak Drive, North College Hill, Ohio and met with the Honorable Judge Tyrone Yates, Hamilton County Municipal Court (Ohio). Judge Yates reviewed the affidavit, opined probable cause existed, and issued the search warrant.

23. At approximately 3:00 p.m. on August 4, 2021, the ATF / Cincinnati Police Department Organized Crime Investigative Squad (OCIS) executed the search warrant at 6927 Pinoak Drive, North College Hill, Ohio 45239 and located approximately two ounces of suspected narcotics packaged in single ounce quantities, and a firearm, further described as an FNH, Model 509, 9-millimeter handgun, bearing serial number GKS0129771, in COACH's bedroom. ATF TFO Chris Vogelpohl processed the firearm for DNA and subsequently submitted test fire shell casings produced by the firearm to NIBIN for comparison to the above-detailed NIBIN Lead. Agents and TFOs also located three additional LG cellular telephones, digital scales, and other paraphernalia indicia of drug trafficking, along with ammunition and magazines corresponding to unrecovered firearms.

24.     At approximately 5:00 p.m. on August 4, 2021, the ATF National NIBIN Training and Correlation Center (NTCC) issued a verbal confirmation the test fire casings generated from the firearm recovered from COACH's bedroom matched crime scene casings recovered during the NIBIN Events detailed above, which include the homicide of Kamar Williams on July 5, 2021, and the ShotSpotter activation on July 21, 2021. Therefore, I believe, based on my training and experience and NIBIN results, that the firearm recovered from COACH's bedroom was used to murder Kamar Williams.

25.     ▉▉▉▉▉▉▉▉▉▉▉▉COACH was transported to the Hamilton County Justice Center where he was charged with Drug Possession and Drug Trafficking.  The following morning, COACH appeared before the Honorable Judge Tyrone Yates for arraignment.  COACH pled not guilty and was given a bond with Electronic Monitoring Unit (EMU) GPS Monitoring requirements, after Det. Craig Chaney (North College Hill Police Department) advised Judge Yates of the recovery of the murder weapon from COACH's bedroom and his suspected involvement in the murder of Kamar Williams on July 5, 2021.

**B.     Records and information indicate that Jamal BINFORD was involved in the Williams and Nuckols murders.**

26.     After COACH was arrested and in custody, ATF TFO Amanda Souders began monitoring calls placed by COACH from the Hamilton County Justice Center and listened to calls in which family members were discussing an altercation between COACH's family and Jamal BINFORD during COACH's arraignment.  Specifically, during a monitored and recorded phone call between COACH and his mother, J.C., they described that during and after COACH's arraignment, COACH's family members, specifically G.C., were involved in a verbal altercation with BINFORD, while waiting in the observation area of the Hamilton County Justice Center Room A Court Room.  The verbal altercation spilled over to the hallway where G.C. was

overheard telling BINFORD that his nephew Antwan COACH won't cover BINFORD's involvement in the murder.  Further, TFO Amanda Souders learned, while listening to monitored and recorded call placed by D.J.[2] from an Ohio Department of Corrections (ODRC) institution to N.H., that BINFORD left Ohio and traveled to Texas with Markel HARDY on or about August 6, 2021 because of the ongoing murder investigation.

27.     On August 12, 2021, I obtained a Hamilton County Court of Common Pleas search warrant authorizing the search of the five cellular devices recovered from COACH during his arrest on August 4, 2021, and a subsequent search warrant for COACH's residence located at 6927 Pinoak Drive, North College Hill, Ohio. I met with the Honorable Jody Luebbers, Hamilton County Common Pleas Criminal Judge, who reviewed the affidavit, opined probable cause existed, and issued the search warrant.  On August 12, 2021, I gave the cellular devices recovered from COACH and the signed search warrant to Officer Steve Villing, Cincinnati Police Department Criminalistics Digital Forensic Specialist, who extracted all available data from the devices.  An analysis of this data showed COACH arranged to meet "Meek" prior to the murder of Kamar Williams on July 5, 2021, and the ShotSpotter event on July 21, 2021. A review of COACH's social media profiles revealed "Meek" is Markel HARDY.

28.     On August 13, 2021, the Cincinnati Police Department Crime Gun Intelligence Center published NIBIN Lead L210844 related to a murder that occurred in St. Bernard, Ohio on August 1, 2021, and to the above detailed shooting offenses.  NIBIN Lead L210844 shows that the firearm recovered from COACH's bedroom, that was used in the July 5, 2021 murder of Kamar Williams and the July 21, 2021 ShotSpotter activation, also fired shots during the murder

---

[2] I know, based on my investigation in this case, that D.J. is Markel HARDY's brother and the son of N.H.

of an individual named Deonte Nuckols on August 1, 2021, at 4810 Chalet Drive #8, St. Bernard, Ohio 45217. Therefore, I believe, based on my training and experience, that the firearm recovered from COACH's bedroom, which he admitted to possessing, is the same firearm that killed Mr. Nuckols three days prior to his COACH's arrest. While investigating the Nuckols murder scene, officers located a cell phone that they believed Nuckols owned.

29.     I contacted Detective Keith Ingram, St. Bernard Police Department, to obtain case specific information regarding the murder of Mr. Nuckols. Detective Ingram had previously obtained a search warrant in the Hamilton County Court of Common Pleas authorizing the search of the cellular device that had been located at the murder scene. Upon extracting data from the cell phone, it was determined that the phone was assigned number 513-602-0172, and contained data showing the cell phone belonged to Mr. Nuckols.  A subsequent review of the data obtained from Mr. Nuckols's device found that approximately seven hours prior to the suspected time of his murder, Nuckols sent the following text message to phone number 614-549-8584 (Contact name: "New New Mal Tx Nephew").  After deconflicting with the Cincinnati Police Narcotics Enforcement Unit and the Drug Enforcement Agency, I learned BINORD had previously used this phone number to communicate with a confidential informant (CI) to discuss narcotics trafficking. The following is a screen shot obtained from the forensic download of Mr. Nuckols phone of that text message, in which BINORD's contact is listed as "New New Mal Tx Nephew."



30.     I later learned BINFORD's mother, T.B., is the sister of the mother of Mr.
Nuckols child (i.e., "nephew"). During the deconfliction discussion with the Cincinnati Police
Narcotics Investigative Unit (NIU) and the Drug Enforcement Agency (DEA), I learned NIU and
DEA were cooperatively investigating BINFORD for unrelated narcotics violations prior to the
inception of the above detailed investigation.

31.     Cincinnati Police Detective Jonce Tackett learned from a confidential and reliable
informant[3] (CI) that BINFORD told the CI that BINFORD maintained a relationship with his
"nephew" involving crimes of violence.  Specifically, BINFORD would instruct his "nephew" to
engage in crimes of violence at his direction.  I know based on my training and experience when

_____
[3] CI is currently cooperating with law enforcement for the betterment of the community.

13

young persons are introduced to crime by older criminals, they are often referred to as "nephew" and may not in fact be related.  I also learned from witnesses who were interviewed regarding the murder of Mr. Nuckols, BINFORD was seen at Mr. Nuckols condominium with a young male with a firearm protruding from his waistband, days prior to his murder.  Detective Tackett also stated BINFORD maintains an apartment at Sycamore Place Lofts, 716 Sycamore Street, Cincinnati, Ohio 45202, where COACH was seen entering and exiting just prior to his arrest on August 4, 2021.

32.     ATF TFO Amanda Souders discovered a recorded and monitored call from the Ohio Department of Rehabilitations and Corrections (ODRC) that was placed on August 1, 2021 at 12:16 p.m. by  E.T., using his inmate ID to place the call, to Jamal BINFORD at phone number 469-989-3033. In this call, BINFORD told E.T. that he provided "a woman" to his uncle, believed to be Deonte Nuckols, and warned his uncle that "she tastes funny."  BINFORD stated his uncle then "shared the woman" with someone else for "fifteen bands" and that his uncle didn't warn the next guy about the "funny taste" and the next guy wanted his "fifteen bands" back.  BINFORD stated that his uncle was trying to tell him to "bring the cheese" back, that it was his uncle's fault for not warning the next guy, and that he (BINFORD) wasn't giving the money back.  BINFORD asserted that the uncle told BINFORD that he needed the money back or he was going to look bad.  E.T. initially didn't seem to understand and thought he was referring to an actual woman, and BINFORD stated to E.T. "you know what I'm talking about." Based on my training and experience in narcotics trafficking, I know that inmates, and those speaking with inmates on monitored and recorded phone lines, use coded language when discussing narcotics trafficking in an effort to impede or obstruct law enforcement's investigation of those crimes.  I know that in this call, BINFORD was describing a narcotics

transaction where he provided Mr. Nuckols with narcotics valued at $15k, who then sold those narcotics to another person.  This person discovered the narcotics were of poor quality and wanted a refund of $15k.

33.     On October 20, 2021, Markel HARDY and Antwan COACH were indicted and charged with murder and aggravated murder related to the deaths of Kamar Williams and Deonte Nuckols.



**C.      Records and information indicate that Jamal BINFORD used cellular phones to communicate about the Nuckols murder.**

36.      On August 20, 2021, I began reviewing data obtained from COACH's phones by Officer Steve Villing.  I found COACH's cellular devices captured specific GPS location information.  COACH's phone GPS showed that the phone was located at the scene of the murder Kamar Williams and the murder of Deonte Nuckols.  Further, the phone download showed that COACH contacted BINFORD at phone numbers 614-549-8584 and 469-989-3033 from COACH's cellular device through Facetime video messaging just minutes prior to and after the suspected time of the Nuckols murder on August 1, 2021.

38.      On August 26, 2021, TFO Souders began monitoring calls from the Ohio Department of Corrections placed to all identified phone numbers used by BINFORD.  During the morning of August 26, 2021, BINFORD received a phone call from an inmate incarcerated for manslaughter in the Ohio Department of Corrections.  During the recorded call, BINFORD

asked the inmate's opinion about people indicted for "a couple of bodies" being able to provide information to law enforcement that would result in someone being charged for ordering the murders. TFO Souders noted that during the call BINFORD's manner of speech and speaking tempo drastically changed while he began asking for the inmate's opinion on the matter. It should be noted COACH was only questioned about one murder (Kamar Williams – North College Hill, July 6, 2021) after his arrest. I am not aware any person outside of law enforcement that knew as of August 26, 2021, that COACH, HARDY, or BINFORD were suspected of involvement in the murder of Mr. Nuckols on August 1, 2021.

39.     Additionally, TFO Souders discovered numerous monitored calls from several inmates at the Ohio Department of Rehabilitation and Corrections in which BINFORD indicated he has continued to protect and provide resources for his "investment." Based on my training and experience and participation in this investigation, I believe BINFORD is referring to Markel HARDY's participation in crimes at the direction of BINFORD, and HARDY's knowledge of BINFORD's participation in the crimes described in this affidavit. Further, I believe, based on my training and experience, and participation in this investigation, BINFORD is protecting his own interest by attempting to prevent law enforcement's discovery of his participation in these offenses by encouraging HARDY to not cooperate with law enforcement through financial support of HARDY's family.

40.     On October 7, 2021, BINFORD called the North College Hill Police Department and stated he would like to speak with an investigator about HARDY.  TFO Souders, Detective Craig Cheney, and I met with BINFORD and a person he alleged was his "lawyer"[4] at the North College Hill Police Department.  During the interview, BINFORD asked if HARDY had warrants for his arrest and if HARDY was currently under investigation.  BINFORD stated that he as a close connection and bond with HARDY, mentors him daily, and has a vested interest in him. BINFORD was not made aware of any ongoing investigations targeting HARDY. BINFORD was advised that HARDY had a traffic capias issued by the Hamilton County (Ohio) Municipal Court and he could be given a new court date via citation (recite).  BINFORD said he would attempt to arrange for HARDY to contact law enforcement to recite him to a future court date.

41.     On October 12, 2021, two arrest warrants were issued for Markel HARDY, charging him with murder and aggravated murder related to the deaths of Kamar Williams and Deonte Nuckols.  I, with the assistance of the Cincinnati Police Department SWAT Team, arrested HARDY at his residence in Cincinnati, Ohio the same day.

---

[4] I later learned that the person BINFORD identified as his lawyer was not a licensed attorney in the state of Ohio but was a recent graduate of a law school in Connecticut.  Further, I learned this person was being mentored by, or was an intern with, HARDY's lawyer who represents HARDY on his current murder indictment.

42. During the execution of the arrest warrant of HARDY and a subsequent execution of a search warrant at his residence, I located cellular devices possessed and used by HARDY, and subsequently obtained a search warrant in the Hamilton County Court of Common Pleas authorizing the search of those devices for evidence related to the murders of Mr. Williams and Mr. Nuckols. During a review of the data obtained from the search of HARDY's devices I located data showing BINFORD's contact with HARDY from BINFORD's cellular device both before and immediately after the murders of Mr. Williams and Mr. Nuckols.

43. TFO Souders located recorded and monitored phone call placed by HARDY from the Hamilton County Justice Center (HCJC) to his mother, N.H. at phone number 513-884-6864, on October 12, 2021. During this investigation, N.H. has used this phone number to make contact with me, identify herself as HARDY's mother, and to arrange for an interview. During this call, BINFORD, who was at HARDY's mother's house, said he would obtain an attorney for HARDY and put money on his "books." BINFORD also said he would take care of HARDY's pregnant girlfriend, Girlfriend 1. Further, during another recorded jail call, BINFORD was at HARDY's mother's house located at 4131 Talbert, Cincinnati Ohio, and told HARDY to not cooperate with any law enforcement investigations. During this investigation TFO Souders has monitored numerous hours of recorded and monitored phone calls involving HARDY, BINFORD, COACH, and their family members. TFO Souders can easily identify each person by their voice and pattern of speech, and recognized BINFORD as the voice in the above detailed phone calls. Further, during the review of data obtained from the installation of court authorized pen register / trap and trace services on phone numbers used by BINFORD, I learned that BINFORD maintains continual contact with HARDY through Girlfriend 1 and HARDY's mother, N.H..

44.     Throughout this investigation, TFO Souders continued to review calls from the Hamilton County Justice Center and Ohio Department of Rehabilitation and Corrections, and learned from recorded calls that BINFORD left Cincinnati, Ohio on October 19, 2021 and returned to Frisco, Texas.  TFO Souders learned during the recorded calls, that BINFORD was advised by several of HARDY's family members they were interviewed by the "ATF Task Force" and there were questions about his involvement with HARDY.  Based on pen register / trap and trace data, and correctional institution calls, I learned that BINFORD then discontinued using the cellular service that is assigned number 469-989-4804 the day after HARDY was arrested and added phone number 513-910-9804 to his Verizon Wireless plan.  In recorded and monitored correctional institution phone calls, BINFORD indicated to Girlfriend 1, HARDY's girlfriend, that he (BINFORD) will only accept Facetime calls from HARDY's family members and believes that he is "being watched by the feds."

**D.    On December 14, 2021, ATF executed a search warrant in the Eastern District of Texas for Jamal BINFORD's body, vehicle, and residence in Frisco, Texas.**

45.     On December 14, 2021 I met with the Honorable Kimberly Priest, United States Magistrate Judge, Eastern District of Texas, to obtain search warrants authorizing the search of Jamal BINFORD's body, his 2018 BMW 7-Series sedan (VIN WBA7E4C53JGV28135), and his residence located at 2266 Fox Crossing Lane, Frisco, Texas, 75036.   Magistrate Judge Priest reviewed the affidavits in support of the search warrants and opined probable cause existed to issue the search warrants.

46.     On December 15, 2021, with the assistance of the ATF Dallas Field Office and the Frisco Police Department (FPD), I executed the search warrants of BINFORD's body and BMW sedan.  At approximately 9:42 a.m., FPD Officer Ken Wang executed a traffic stop of BINFORD's vehicle after it was seen leaving 2266 Fox Crossing Lane, Frisco Texas.  During a

search of BINFORD's person, Officer Wang located a Taurus handgun, Model PT111, 9mm, Serial Number TKS27720, that was loaded with 10 rounds of 9mm ammunition. Also located during the search of BINFORD and his vehicle were two cellular devices, further described in Attachment B. During the traffic stop and search, BINFORD stated there were firearms in his residence, as well as marijuana. BINFORD stated he was a marijuana user and used marijuana for his PTSD because he felt the side effects from prescription medication were too severe. BINORD told TFO Amanda Souders he wished to speak with her about the investigation and he was transported to the Frisco Police Department to be interviewed.

47.     With the assistance of the ATF Dallas Field Office, I executed the search warrant of BINFORD's residence at 2266 Fox Crossing Lane, Frisco, Texas 75036. During the search of his residence, law enforcement located eleven cellular devices, a VICFUN brand flash drive memory device, an Apple Ipad Mini, and an Apple Macbook laptop, which are further described on Attachment B. ATF Agents also located three firearms, further described as a DPMS AR-15 style rifle, model A15, 5.56 caliber, serial number FH234876; a Masterpiece Arms pistol, model MPA30T-GR, 9mm, serial number FX04324; and a Weihrauch Hermann revolver, model EA/R, .38 caliber, serial number 1719942. Agents also located approximately 463 rounds of ammunition in various calibers and brands.

48.     Prior to searching BINFORD's residence, BINFORD stated he was the only person who resided at 2266 Fox Crossing Lane, Frisco, Texas 75036. BINFORD stated he infrequently allowed boxers to stay at his residence in a spare bedroom to train for upcoming boxing events. When stopped by Officer Wang, BINFORD was transporting Individual 1 who is a former professional boxer (2009-2016) to a local gym for training. Individual 1 stated his cellular telephone was on the passenger seat of BINFORD's car, which I subsequently returned

21

to him after verifying his ownership of the device. Individual 1 stated he was from Florida and was staying with BINFORD while training in the area. After verifying Individual 1's identity, he was sent on his way from the traffic stop. Individual 1 subsequently stated he had clothing at BINFORD's residence and waited for the completion of the search warrant to obtain his belongings from the house.

49.     During the search of BINFORD's residence, numerous cellular devices were found in BINFORD's bedroom, in both plain view on top of furniture and secreted inside his bedroom furniture under drawers on the interior support structure. Further, a thumb drive USB storage device, stored in a zip-loc type plastic baggie with a phone sync USB cord, was found in a duffle bag next to an Apple iPhone retail box. An Apple MacBook computer was found in BINFORD's office, which displayed his Honorable Discharge certificate and contained numerous pieces of mail and correspondence addressed to BINFORD. An Apple iPad and an additional cellular telephone were located in upstairs bedrooms, one of which appeared to belong to a child of which BINFORD is the non-custodial parent.

50.     TFO Amanda Souders and I interviewed BINFORD at the Frisco Police Department. BINFORD admitted to possessing / owning all the firearms found on his person and in his residence, and stated he was unaware it was a violation of federal law to be an unlawful user of marijuana and possess firearms. When asked about the cell phones which were found in his residence, BINFORD could not explain why he hid cell phones inside his bedroom furniture.

**E.     The Devices likely contain relevant evidence.**

51.     As explained above, the **Devices** are currently in the lawful possession of the ATF after being seized pursuant to the above-described search warrants. I seek this search warrant to

assure certainty the examination of the **Devices** will comply with the Fourth Amendment and other applicable laws.

52.      The **Devices** are currently in storage at the ATF Cincinnati Field Office, 550 Main Street, Room 8-491, Cincinnati, OH 45202. In my training and experience, I know that the **Devices** have been stored in a manner in which their contents are in substantially the same state as they were when the **Devices** first came into the possession of ATF, to the extent material to this investigation.

53.      I know, based on my training and experience, that the average person maintains cellular service and cellular devices to conduct personal business and aid in daily tasks.  Further, persons may maintain multiple cellular devices to separate personal and professional tasks and routinely carry these devices on their bodies, in their residences, and in their vehicles, to conduct their personal and professional business at a moment's notice, and to use these devices to increase convenience and access to information and services.  Further, those who engage in criminal activities use these devices to further their participation in crimes, to include coordination and communication with co-conspirators, obtain firearms, contraband, or other means of facilitating their criminal activities, and to obtain or distribute information to co-conspirators which is necessary for their illegal activities.  I also know that those engaged in criminal behavior may carry two or more devices to separate normal day-to-day cellular activities from their criminal cellular activities, to include FaceTime logs, text messages, chats, photographs, location information, and website history.  I also know from experience that it is common for individuals to keep and store their old cell phones, because they may not want to lose information, text messages, contact information, and photos saved to that device; such "old" phones may also contain information relevant information to ongoing criminal investigations.

## **TECHNICAL TERMS**

54.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a

screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can

mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

j. Thumb drive: A thumb drive, also referred to as a USB drive or flash drive, is a small solid-state drive that connects to another electronic device, such as a computer or cell phone, through a USB port, that allows users to transfer files and data to / from most personal electronic devices, including cellular devices and laptop computers.

55.     Based on my training, experience, and research, including, but not limited to, consulting the manufacturer's advertisements and product technical specifications available online at www.apple.com, I know that an iPhone cellular device has capabilities that allow it to serve as a cellular telephone, GPS enabled navigation device, portable media player, application

enabled messaging device, camera, interface with the internet, data storage device, digital payment method, health monitor, and other functions activated by the user through the installation of third-party applications. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, the user's involvement in crimes, the identification of co-conspirators, the construction of schemes and plans related to crimes, and other data showing the user's participation in the crimes being investigation.

56.     Based on my training, experience, and research, including, but not limited to, consulting the manufacturer's advertisements and product technical specifications available online at www.apple.com, I know that an iPad Mini tablet has capabilities that allow it to serve as a cellular telephone through wi-fi interaction with an iPhone, GPS enabled navigation device, portable media player, application enabled messaging device, camera, interface with the internet, data storage device, digital payment method, health monitor, and other functions activated by the user through the installation of third-party applications. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, the user's involvement in crimes, the identification of co-conspirators, the construction of schemes and plans related to crimes, and other data showing the user's participation in the crimes being investigation.

57.     Based on my training, experience, and research, including, but not limited to, consulting the manufacturer's advertisements and product technical specifications available online at www.apple.com, I know that an Apple MacBook laptop computer has capabilities that allow it to serve as a traditional computer, cellular telephone through wi-fi interaction with an iPhone, GPS enabled navigation device, portable media player, application enabled messaging

device, camera, interface with the internet, data storage device, digital payment method, and other functions activated by the user through the installation of third-party applications. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, the user's involvement in crimes, the identification of co-conspirators, the construction of schemes and plans related to crimes, and other data showing the user's participation in the crimes being investigation.

58. Based on my training, experience, and research, including, but not limited to, consulting the manufacturer's advertisements and product technical specifications available online at www.android.com, www.samsung.com, www.LG.com, www.consumer.huawei.com, and www.alcatelmobile.com, I know that Android cellular devices have capabilities that allow them to serve as a cellular telephone, GPS enabled navigation device, portable media player, application enabled messaging device, camera, interface with the internet, data storage device, digital payment method, health monitor, and other functions activated by the user through the installation of third-party applications. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device, the user's involvement in crimes, the identification of co-conspirators, the construction of schemes and plans related to crimes, and other data showing the user's participation in the crimes being investigation.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

59. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period on the device. This information can sometimes be

recovered with forensics tools.

60. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of afile (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, whoused them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope ofthe warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

f.  I know that when an individual uses an electronic device to offer firearms for sale or to conspire with others, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The electronic device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was used; data that was sent or received; and other records that indicate the nature of the offense.

61.  *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

62.  *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

63.     I submit that this affidavit supports probable cause for a warrant to search the

**Devices** described in Attachment A and seize the items described in Attachment B.

### **REQUEST FOR SEALING**

It is respectfully requested that this Court issue an order sealing, until further order of the

Court, all papers submitted in support of this application, including the application and search

warrant. I believe that sealing this document is necessary because the warrant is relevant to an

ongoing investigation into a criminal conspiracy, and not all targets are in custody. Premature

disclosure of the contents of this affidavit and related documents may have a significant and

negative impact on the continuing investigation and may severely jeopardize its effectiveness.


                                        Respectfully submitted,



                                        _____
                                        Joseph M Ruchti
                                        Task Force Officer
                                        Bureau of Alcohol, Tobacco, Firearms and
                                        Explosives


Attested to by the Applicant in accordance with Fed. R. Crim. P. 41 this 14th day of
January 2022. **via electronic means, specifically Facetime video.**


_____
THE HONORABLE STEPHANIE K. BOWMAN
UNITED STATES MAGISTRATE JUDGE


32

# ATTACHMENT A

## *Property to be Searched*

1.      The property to be searched is currently located in ATF Property under case

number 773010-21-0113 at ATF Cincinnati Field Office, 550 Main Street, Room 8-491,

Cincinnati, Ohio 45202 and listed as the following ATF Property Numbers:

    a.  Item 031 – Apple iPad Mini tablet, model A1490, in black case, no serial number visible

    b.  Item 032 – Vicfun brand thumb drive (usb), no serial number visible

    c.  Item 033 – Apple MacBook laptop computer, model A1466, no serial number visible

    d.  Item 034 – Alcatel cellular telephone, flip style, black, no serial number visible

    e.  Item 035 – T-Mobile cellular telephone, IMEI 015727002609221, with cracked screen

    f.  Item 036 – Samsung Galaxy S7 Edge cellular telephone, black case, no serial number visible

    g.  Item 037 – Alcatel cellular telephone, flip style, black, no serial number visible

    h.  Item 038 – Samsung cellular telephone, IMEI 354084111149635, cracked screen and rear cover

    i.  Item 039 – LG cellular telephone, cracked screen, black

    j.  Item 040 – Apple iPhone cellular telephone, white, no serial number visible

    k.  Item 041 – Samsung SM-N975U1 cellular telephone, IMEI 35901100438075, blue

    l.  Item 042 – Apple iPhone A1549 cellular telephone, IMEI 354450066736033, silver

    m.  Item 043 – Huawei cellular telephone, black, no serial number visible

    n.  Item 044 – Apple iPhone cellular telephone, black, no serial number visible

    o.  Item 047 – Apple iPhone cellular telephone, model 13, serial number P4T64DQGH4

    p.  Item 048 – Apple iPhone cellular telephone, model SE, serial number DX4G2JAFPLJM

This warrant authorizes the forensic examination of the Devices for the purpose of identifying

the electronically stored information described in Attachment B.

## ATTACHMENT B

*Property to be Seized*

1.      All records on the Devices described in Attachment A that relate to violations of 18 U.S.C. § 1958 (Use of Interstate Commerce Facilities in the Commission of Murder-For-Hire) and 18 U.S.C. § 922(g)(3) (Possession of a Firearm by a Prohibited Person) and involve Jamal BINFORD, Antwan COACH, and Markel HARDY.

    a.   Records and information relating to a conspiracy to commit of Murder-For-Hire;

    b.   Records and information relating to the commission of Murder-For-Hire;

    c.   Records and information relating to the possession, purchase, sale, or trafficking of firearms;

    d.   Records and information relating to the identities and whereabouts of co-conspirators to the scheme;

    e.   Records and information relating to the proceeds of the Murder-For-Hire;

    f.   Records and information relating to phone numbers, email addresses, social media accounts, and other accounts used by coconspirators to the scheme;

    g.   Records and information relating to the use and purchase of marijuana

2.      Evidence of user attribution showing who used or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.